2017 WY 110

### IN the INTEREST OF: L-MHB, A Minor Child,

DM, f/k/a DF, Appellant (Respondent),

v.

### The State of Wyoming, Appellee (Petitioner).

S-17-0026

Supreme Court of Wyoming.

September 19, 2017

Representing Appellant: Deborah L. Roden of Woodhouse Roden Nethercott, LLC, Cheyenne, WY. Argument by Ms. Roden.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Misha E. Westby, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; and Shawnna M. Herron, Senior Assistant Attorney General. Argument by Ms. Herron.

Guardian Ad Litem: Office of the State Public Defender: Dan S. Wilde, Deputy State Public Defender; and Aaron S. Hockman, Chief Trial and Appellate Counsel, Wyoming Guardian ad Litem Program.

Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.

HILL, Justice.

[¶1] DM (Mother) gave birth to L-MHB on April 15, 2014, and the child was immediately placed in protective custody due to concerns that Mother was a danger to her and was unable to properly care for her. The juvenile court held timely shelter care, initial, and adjudicatory hearings, but there were inordinate delays in the court's issuance of adjudication, disposition, and permanency orders.

[¶2] Mother appeals the court's permanency order, which changed the permanency plan for L-MHB from family reunification to adoption. She contends that the order violated her due process rights, made inadequate findings, and was not supported by sufficient evidence. We affirm.

## ISSUES

[¶3] Mother states the issues on appeal as:

### ISSUE I

The juvenile court's order changing permanency violated DM's constitutional due process rights because it was entered without notice or an opportunity to be heard, counted pre-adjudication and disposition delay against DM, and failed to make the requisite statutory findings on permanency.

### ISSUE II

The juvenile court erred in ordering permanency to be changed from reunification to termination and adoption as the record does not support a finding that the Department of Family Services provided reasonable efforts or that DM had not made sufficient progress on her case plan.

## FACTS

[¶4] Mother gave birth to L-MHB on April 15, 2014, and on April 17, 2014, the State filed a petition alleging neglect. Attached to the State's petition was an affidavit by the pediatrician who examined L-MHB shortly after her birth. The affidavit attested:

1. At 10:18 P.M. on April 15, 2014, [Mother] gave birth to a baby girl at Cheyenne Regional Medical Center.

2. I placed a protective hold on [Mother's] baby because I believe that the baby would be in danger if she were to be discharged or in the hospital room with [Mother].

3. I believe the baby is in danger for the following reasons:

a. [Mother] was an inpatient on Cheyenne Regional's Behavioral Health Unit twice during this pregnancy. Both admissions she reported suicidal tendencies. Her verbalized suicide plans ensured that the unborn baby she was pregnant with would also die.

b. During an inpatient behavioral health admission [Mother] asked staff how she could kill the baby she was carrying, and how long it would take to kill the baby.

c. [Mother] has reported using drugs during this pregnancy.

d. [Mother] has not followed up with a mental health treatment regime despite her hospitalizations and is not currently on medication for her depression or suicidal ideations.

e. [Mother] is unhygienic and I feel she is unable to properly care for her child.

f. [Mother] has relayed that she stops breathing at night and that her dog must jump on her to restart her breathing.

4. As such, I believe that the Department of Family Services needs to take protective custody of [Mother's] child.

[¶5] On April 17, 2014, the juvenile court held a shelter care hearing, which was attended by Mother and her attorney. Following that hearing and on that same date, the court issued a shelter care order directing that legal custody of L-MHB remain with the State and that she be placed in foster care upon discharge from the hospital. On April 22, 2014, the court issued an order directing the Department of Family Services (DFS) to prepare a predispositional report.

[¶6] On May 8, 2014, the juvenile court held the first of two initial hearings. During that hearing, Mother's attorney indicated that he had a potential conflict of interest, and the court continued the proceeding to ensure Mother had counsel before admitting or denying the neglect petition allegations. Mother's attorney also informed the court that Mother was concerned that she was being denied visitation with her child. Counsel for the State responded to those concerns, explaining:

* * * [Mother's Attorney] indicated that the mother's visits have stopped. At this time, that is correct. She has been very threatening to the supervising staff at her last visit. She displayed a knife that she had brought to the visit, and the supervisor had safety concerns about that. She has made a number of threatening statements about murdering people, about the State messing with the wrong family, such that the supervisors who supervise the visits have concerns for their safety, and the safety of the child.

That being said, it is the intention of the team that works with her to try and meet with her to see if we can't establish some ground rules so that we could begin visits again, but until that occurs, at this time we're going to quickly run out of individuals willing to supervise her with that type of behavior. So at this time, there are no visits going on, but we hope to remedy that shortly.

[¶7] At the close of the first initial hearing, the juvenile court ordered legal custody to remain with the State and L-MHB to remain in foster care. The court also instructed Mother to cooperate with DFS and attend meetings of the multidisciplinary team (MDT).

[¶8] On May 29, 2014, the juvenile court held a second initial hearing. Mother denied the allegations of the neglect petition, informed the court that she had not been permitted visitation with the child since the first initial hearing, and requested that visitation be resumed. Counsel for the State reported:

I do have a letter from her treating psychiatrist, which does not recommend visits at this time. I would also share with the Court that we did make efforts to see whether or not the Laramie County Sheriff's Department would be willing to participate with us in providing some assistance for supervised visits, and currently, based upon the information they've received, they are unwilling to do that.

So we are not in a position where we feel that we can ensure the safety of the child, and would ask again that the Court consider at this time ordering no visitation.

[¶9] Following the second initial hearing, the juvenile court again ordered legal custody to remain with the State and L-MHB to remain in foster care. With respect to visitation, the court did not foreclose visitation, but ordered any visitation to be supervised and at the discretion of DFS and the child's guardian *ad litem* (GAL).

[¶10] On July 22, 2014, the juvenile court held an adjudicatory hearing. After hearing the State's and Mother's evidence, the court took the adjudication under advisement. On November 20, 2014, the court held its first

statutorily required six-month review hearing.[1] By the time of this first review hearing, the court had not issued an adjudication order. Additionally, Mother had married and moved to Casper, Wyoming with her new husband, and Mother's attorney indicated that she would be filing a motion to transfer the case to Casper.[2] The court commented:

Very well. And I'll indicate to you that, while, as I say, regrettably it's been under advisement, the Court does have the record of the proceeding and the exhibits to review, but that review will occur shortly. Probably give it a week before you file your motion, because, of course, depending on the ruling, there may be no motion to file.

The Court will today direct, whether it's for a week or through to disposition, depending on the ruling, I will order in the interim that the minor remain in the legal custody of the State, and subject to foster care at this point.

[¶11] About four months later, on March 24, 2015, the juvenile court issued a decision letter directing entry of an order adjudicating Mother neglectful. The court wrote:

I am writing to direct entry of an order adjudicating the mother neglectful. The trial of the matter on July 22, 2014, should have resulted in findings and an order. There is no indication as to why the order was never entered, other than this Court not formalizing the matter. This delay is neither contrary to the minor's interests, nor the mother's, as review activity has continued in the normal course of events despite the absence of formal adjudication.

The Court has reviewed the matter, including the record of all proceedings and finds by clear and convincing evidence that the minor here was neglected and subject to probable and imminent abuse or harm as the mother was unable to safely provide for her baby upon its birth due to her compromised mental state.

The mother admits some, but not all of the statements she made to the medical professionals, including expression, pre-birth, of her intentions to step in front of a truck and end her and the baby's lives. Her own suicidal ideations and some actions taken just prior to birth make out a present danger to the baby upon birth.

She expressed notions immediately following the birth which evidenced paranoia and a complete disconnect with reality that also made her a danger to the baby. She was, at the time of the filing of this Petition, totally incapable of caring for anyone safely. For instance, her insistence that an ex-boyfriend had his friends positioned as snipers around the hospital, (a statement repeated, and apparently believed by the mother at trial in July, many months later), make it clear her well established mental condition make her a danger to the minor.

[Counsel for the State] is to prepare the order in this regard, including a directive that the matter be set for disposition. [Counsel for Mother] is to approve the order to form. Any objections to the procedure should be drawn to the Court's attention by Motion within fifteen (15) days of the order being entered.

[¶12] On April 15, 2015, the juvenile court entered its adjudication order, adjudicating L-MHB neglected and Mother as having neglected L-MHB. Mother did not appeal or file an objection to the adjudication order. On April 23, 2015, Mother filed a motion to change venue, and the court combined the hearing on that motion with its disposition hearing, which was held on May 20, 2015. At the disposition hearing, the court heard argument and recommendations from the State, the GAL, and Mother, both on disposition

---

1. Wyo. Stat. Ann. § 14-3-431(c) (LexisNexis 2017) requires the juvenile court to hold a review hearing six months after a child's removal from the home and every six months thereafter to determine: the child's health and safety; continuing necessity for placement; the appropriateness of the current placement; the reasonableness of efforts made to reunify the family; the appropriateness of the case plan and the extent of compliance with that plan; progress made toward alleviating or mitigating the causes that necessitated the child's placement outside the home; and the date the child is expected to be returned to the home or placed for adoption or guardianship.

2. Mother's new husband was not the biological father of L-MHB.

and the motion to transfer venue. The court then orally ruled that it would deny Mother's venue motion and further ruled:

The dispositional order will continue the legal custody in the State, and placement of the minor, and cooperation by [Mother] with the case plan. It is imperative—this year has gone by—not only months have gone by the time of the adjudicatory hearing, but even at the adjudicatory hearing, it was evident to this Court that she did not even back off of some of—if they were delusions or they were real and they were just very strange, whatever they were, she is an individual who struggles. There is no question that she's struggling. This Court is not separating her from this child because she is, sadly, struggling with mental illness.

I separated and continue to separate this woman from this child for the baby's safety. And the safety net that could have developed over the last year—with no visitation, the safety net could have developed, and work could have been done all along the way that has not been done. Now, she is someone clearly who doesn't want the government, and medical providers and so forth in her life, or the government to know what her medical providers say.

There is no way out of it now[.] [Mother] has got to comply with this case plan. There has got to be this sharing of a complete psychological evaluation, and at this point, in the child's interest, there has to be deadlines. The complete psychological evaluation completed and in the hands of the guardian ad litem immediately, or no longer than sixty days, and at the same time, any identified mental health provider has to be identified as having a release from her to speak to the Department and to the guardian ad litem.

That is a horrible invasion of privacy. I absolutely understand it, and I can even imagine [Mother's] face if she was in the courtroom to me saying this, but this is a

baby, and if that baby is going to go safely home, I have to know these things, and a year has gone by. That is unacceptable. And there are procedural glitches and all that. We've done our review hearings, but there have been procedural glitches, but what's done is done. We have to reunify this family, and step one is that case plan.

[¶13] On July 23, 2015, the juvenile court entered its written disposition order. The order directed that legal custody of L-MHB would remain with the State, placement would remain foster care through DFS, and family reunification would remain the goal. The order further directed, consistent with the court's oral ruling, that Mother: Continue to comply with her case plan; complete a psychological evaluation within sixty days of the May 20, 2015 disposition hearing and provide those results to DFS and the GAL; immediately sign and provide all releases from any mental health providers to DFS and the GAL; and participate in random UAs.

[¶14] On November 5, 2015, the court held another six-month review hearing.[3] The State and GAL recommended that a permanency hearing be held and that the permanency plan be changed from reunification to adoption. Mother maintained that reunification should remain the goal. On that same date, the court issued an order finding that reasonable efforts to reunify were being made and directing that family reunification remain the permanency plan. On November 12, 2015, the court issued an order setting a permanency hearing for January 14, 2016.

[¶15] On December 11, 2015, L-MHB's former foster parents filed a motion to intervene in the neglect case, citing their custody of L-MHB from April 2014 until September 30, 2015, and their continuing desire to be a part of her life and adopt her if reunification were to fail. On January 7, 2014, the court held a hearing on the motion to intervene and orally denied the motion but also ruled

---

3. Between entry of the disposition order and the November 2015 review hearing, L-MHB was placed in a new foster home. This occurred in September 2015 because the former foster parents were unable to recertify as foster parents. Counsel for the former foster parents explained that the former foster mother "made what she would say is an error in judgment. She decided to leave her nine-year-old watching the baby while she slept. And she ran to the store quickly."

that the former foster parents would be permitted a limited opportunity to be heard at any permanency hearing.

[¶16] On January 14, 2016, the juvenile court held an evidentiary permanency hearing. Mother did not testify or present any other witnesses at the permanency hearing. The State called only one witness, Athena Loftus, the assigned DFS caseworker. Ms. Loftus testified:

—A case plan was prepared in June 2014, and Ms. Loftus had discussed the plan with Mother;

—In May 2014, Detective Chapman of the Laramie County Sheriff's Office attempted to facilitate visits between Mother and L-MHB by contacting Mother's medical providers for assistance and those providers advised against in-person visits because of the potential danger to the child;

—In July 2015, Mother's husband was charged with a domestic violence charge when he attacked Mother, and a no contact order was thereafter entered against Mother's husband;

—In September 2015, Mother reported she was sleeping in a tent in the front yard of her husband's parents;

—Later in September 2015, Mother reported she was living in the home with her husband's parents;

—Mother's husband had his own parental rights terminated in 2012;

—As a minor, Mother's husband was substantiated for sexual abuse of his sister;

—DFS set up a contract in Casper to allow Mother to have the UAs required by the case plan at DFS expense, and Mother successfully completed six UAs and failed to appear for thirteen UAs;

—Mother had a psychiatric evaluation in May 2015, but she refused to allow the evaluator access to her prior records;

—The doctor who completed the psychiatric evaluation recommended psychotherapy, medications to stabilize Mother's mood and personality disorders, and completion of the UAs required under the case plan;

—The doctor who completed the psychiatric evaluation was concerned with the interaction between Mother and her husband, describing the combination as "pouring oil on a fire;"

—She has no knowledge that Mother is taking her prescribed medications;

—Mother has not established "a safety plan that acknowledges her mental health shortcomings and explains how she might care for her child should she have those challenges occur;"

—DFS offered Mother Skype visits with L-MHB and she declined those visits; and

—When DFS changed L-MHB's foster placement in September 2015, it chose a Cheyenne foster family because L-MHB was receiving developmental and medical services in Cheyenne and Denver.

[¶17] At the close of the permanency hearing, the court took the matter under advisement. On April 4, 2016, the court issued an order entitled Order Upon Permanency Hearing, which stated "that this Court hereby takes the matter under judicial advisement." The court further ordered

that not later than six (6) months from entry of this Order that the Laramie County Field Office of the Wyoming Department of Family Services advise this Court if the plan for working toward the best interests of the minor child has not been achieved, at which time this Court shall set a hearing in this matter.

[¶18] On July 7, 2016, the juvenile court held its third review hearing. At the time of this hearing, Mother was still living in Casper and had a week earlier given birth to another child. Mother, citing the need to care for her new child, did not appear at the review hearing, in person or by telephone, but her attorney was present. The State informed the court that although the permanency hearing had been held in January, permanency had not yet been ruled on, and the State again recommended that the permanency plan be changed to adoption. Mother's attorney also expressed her understanding that permanency had not yet been ruled on and informed the Court that Mother wished to change her permanency recommendation from family reunification to a guardianship in L-MHB's former foster parents.

[¶19] Although the State and Mother expressed their understanding that no permanency order had been entered following the permanency hearing and that the question of permanency was still under advisement, the juvenile court viewed the permanency status differently. The court explained that the intent of its written order was to hold the permanency determination in abeyance for six months to allow the parties additional time to work toward reunification. The court then had the following exchange with the attorneys present:

So I anticipated, while it was—rather than—I didn't order a final permanency, but rather than do that—I'm going to use colloquial terms for it. I wasn't ready to pull the trigger, so I gave her six more months to comply with the case plan, and if she didn't, I'd hear from you all. Well, the Department, but you all.

So that's a misunderstanding about the review procedure. I've heard again today what the competing arguments are. My plan, whether it was understood as an order or not, hasn't worked out well. If you have something else concerning permanency at this stage, I'll execute an order promptly following this proceeding on permanency, unless you want to provide me something else, and I'll start again. [Counsel for the State], anything else?

[Counsel for the State]: No, Your Honor.

THE COURT: And [GAL], anything else?

[GAL]: No, Your Honor.

THE COURT: And [Counsel for Mother]?

[Counsel for Mother]: No, Your Honor. Thank you.

THE COURT: Very well. The courts don't often say, hey I entered an order, but never mind, but never mind, Ms. Loftus. It's not getting any better. Baby or no baby, [Mother] didn't appear, and it doesn't appear to me that three more months is going to make any difference, and clearly, there was enough evidence based on the file for me to make a change of permanency decision. What that decision is will be issued in writing by the Court.

[¶20] On October 25, 2016, the juvenile court issued an Order Changing Permanency. The permanency order stated:

**THIS MATTER HAVING COME BEFORE THE COURT** on several occasions including January 14, 2016, at which time the Court heard and considered evidence and argument from all parties concerning the recommendation that permanency should be changed to adoption, the Court having subsequently heard from the parties on July 7, 2016, and learned that no progress had been made while the permanency decision was under advisement, the Court having previously taken judicial notice of the file and the proceedings to date finding clear and convincing evidence that reunification has failed, and now being otherwise well advised **ORDERS**:

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that, it being contrary to the interests of the minor to reunify this family, and the State having diligently pursued that goal to no avail, Permanency in this matter is hereby changed to Adoption.

[¶21] On November 10, 2016, the juvenile court held another six-month review hearing. During that hearing, the State updated the court as follows:

* * * We are in receipt of the October order from the Court changing permanency in this matter. Prior to receipt of that order for permanency, the Department did make efforts to set up a contract in South Dakota where [Mother] has relocated to take UAs. There was a delay in setting up that contract, because we were having to go through multiple state agencies. [Mother] declined to participate in any UAs until that contract was set up.

Additionally, the Department set up a contract for psychological evaluations, as well as individual counseling, and [Mother] declined to participate in that as well.

[L-MHB] is doing very, very well at her foster home. She attends speech therapy weekly through Stride, but Stride has found that she no longer needs any of the additional services that she was previously receiving. She does participate in day-care a few times a week. She enjoys seeing the

other kids at day-care. She did have to have surgery to have her tonsils and adenoids removed, and that seems to have helped her with a breathing problem she's developed.

We continue at this time to recommend legal custody remain with the Department of Family Services for physical placement in foster care. The Court has previously changed the permanency plan to adoption. We would ask that that continue. Upon receipt of the Court's order, which I believe was filed in late October, on October 31st, my office made a referral to the Department, to the Attorney General's office to begin the termination proceedings. So they're just in the early stages of reviewing that file to begin a termination proceeding as to the parents.

We did have one father identified—or a potential father identified by [Mother]. That individual was tested and determined not to be the father. She has declined to share with the Department any additional information as to potential fathers, so no additional fathers have been able to be—or potential fathers contacted or identified.

[¶22] Both the GAL and Mother's attorney indicated they had not received the juvenile court's permanency order. The court indicated it would look into the service of the order and read the order out loud. The GAL agreed to the change in permanency from reunification to adoption. Mother's attorney responded:

Your Honor, I'm trying to gather my thoughts quickly. In light of the order changing permanency, I simply would put on the record what has already been in the record, which is that my client has supported adoption with the * * * prior foster parents. I know this Court is aware that there is a separate adoption petition filed by the [prior foster parents] pending before Your Honor, which the State does not support.

I do believe [Mother] has a statutory right to weigh in on the adoption. She has residual parental rights, which includes specifically under the statute the right to consent or participate in an adoption. She's made her requests clear. I suppose at this

stage there will be the [former foster parents'] petition pending, perhaps a termination by the State all happening at the same time.

[¶23] The juvenile court instructed Mother's attorney to request a hearing if something additional occurred to her after the review hearing. The court then concluded the hearing with the following:

Thank you. Well, certainly, it's regrettable, however it happened, that some of the parties appeared without knowledge of the Court's order. It's not really so regrettable that it took so long, although, I'm sure that's how you all feel, maybe how the [former foster parents] feel, how everybody feels. But, I, unlike you all, I had an opportunity, because I wrote that decision, wrote that order, to review everything including the transcripts of these prior proceedings far back into the case, and of course, through the factual presentation.

It was clear to everyone, because it was happening in open court, that in effect, it was taken under advisement as a stall, as a last opportunity to see how it went for the next six months. It was set, not quite at the six month mark, and I reviewed that proceeding, the presentation of all the parties, and arguments at that proceeding as well, and there's no question that that's where the case is, right on the edge of termination of parental rights by consent adoption, by a different proceeding, and it leaves me with a question about, what am I supposed to do in the meantime? I have a new custodian, and now a sole legal custodian, the State of Wyoming.

I intend to leave it at that. No reunification efforts are necessary. The best interests of [the] child are being met by the legal custody and the foster placement as they see fit. * * * So I just want it to be clear, because it's going to get tricky otherwise with the Attorney General and so forth, I'm imposing no restriction on where the child lives or resides other than they have to see to the child's best interests, and the State, I have confidence, will do so.

* * * *

You now seem to all agree that adoption is the path. The State disagrees with you,

[Mother's Attorney], because you agree with the [former foster parents], and that's not mine to decide today, but I just want to make sure that the door is open, but I'm doing nothing other than wishing this child and the Department of Family Services as sole legal custodian the best. I believe they're doing all the things they should do otherwise as to age and developmental authority, and I even heard in the mi[d]st of all this some good news about it.

So I'll make those brief findings, enter the order continuing legal custody, and the Court is in recess.

[¶24] On November 23, 2016, Mother filed a timely notice of appeal to this Court, which identified the October 25, 2016 Order Changing Permanency as the order being appealed.

## STANDARD OF REVIEW

[¶25] Mother first claims that the juvenile court violated her right to due process of law in the manner in which it ordered a change in permanency. This presents a question of law that we review *de novo*. *KC v. State (In the interest of GC)*, 2015 WY 73, ¶ 16, 351 P.3d 236, 241 (Wyo. 2015) (citing *Verheydt v. Verheydt*, 2013 WY 25, ¶ 20, 295 P.3d 1245, 1250 (Wyo. 2013)). We have also said:

> The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness.

*KC*, ¶ 16, 351 P.3d at 241 (quoting *In re KMO*, 2012 WY 100, ¶ 30, 280 P.3d 1216, 1224 (Wyo. 2012)).

[¶26] The State contends that Mother waived her due process claims when she herself recommended a permanency plan of adoption, and also when she failed to object to the proceedings below or request an additional evidentiary hearing. "While the question of waiver is often one of fact, when the facts and circumstances relating to the subject are admitted or clearly established, waiver becomes a question of law which we consider *de novo*." *Verheydt*, ¶ 21, 295 P.3d at

1250-51 (citing *Wyo. Worker's Safety & Comp. Div. v. Wright*, 983 P.2d 1227, 1231 (Wyo.1999), overruled on other grounds, *Torres v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2004 WY 92, 95 P.3d 794 (Wyo. 2004)).

[¶27] Mother's second claim is that the record did not support the juvenile court's change in permanency and the juvenile court failed to make the findings required to support the permanency change. A juvenile court's permanency decision is reviewed for an abuse of discretion. *PM v. State (In the Interest of SO)*, 2016 WY 99, ¶ 10, 382 P.3d 51, 54 (Wyo. 2016) (quoting *JO v. State, Dep't of Family Servs. (In the Interest of RE)*, 2011 WY 170, ¶ 10, 267 P.3d 1092, 1096 (Wyo. 2011)). We have also said:

> "In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did." *GWJ v. MH (In re BGH)*, 930 P.2d 371, 377–78 (Wyo. 1996) (quoting *Martinez v. State*, 611 P.2d 831, 838 (Wyo. 1980)). "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances." *GWJ*, 930 P.2d at 377.
>
> Assessment of the circumstances of this case, in the context of alleged abuse of discretion, is tantamount to an evaluation of whether the evidence is sufficient to support the decision of the district court. In review of the evidence, we accept the successful party's submissions, granting them every favorable inference fairly to be drawn and leaving out of consideration conflicting evidence presented by the unsuccessful party.

*Basolo v. Basolo*, 907 P.2d 348, 353 (Wyo. 1995) (citing *Cranston v. Cranston*, 879 P.2d 345, 351 (Wyo. 1994)).

*SO*, ¶ 11, 382 P.3d at 54.

## DISCUSSION

### A. Mother's Due Process Claims

[¶28] Mother's due process claims stem from the juvenile court's delays in issuing adjudication and disposition orders and its delay in issuing a permanency order after the permanency hearing. Mother argues that

the court's use of her actions during the period before adjudication and disposition violated her due process rights because there was no order mandating case plan compliance during that period and she had no notice that her actions during that period could be used against her. Second, Mother contends that the court's failure to hold an additional evidentiary hearing before issuing its final permanency order, nine months after the first evidentiary permanency hearing, violated her due process rights because she was not afforded the required notice and opportunity to be heard. Although we are troubled by the delays in this matter, we conclude that Mother waived her due process claims.

[¶29] L-MHB was taken into protective custody immediately following her birth on April 15, 2014. It was a year later, on April 15, 2015, that the juvenile court issued its adjudication order. This was followed by an oral disposition ruling on May 20, 2015, and written disposition order on July 23, 2015, neither of which could issue before the adjudication order. The juvenile court eventually held a permanency hearing on January 14, 2016, but it was not until nine months later, on October 25, 2016, that the court issued its Order Changing Permanency.

[¶30] There is no justification for these delays. As to the delay in adjudication, the record is silent and provides no explanation for the delay. As to the delay in issuing a permanency ruling, the juvenile court explained that it delayed its permanency ruling to give Mother an additional six months to work toward reunification. We reject this explanation. If the court could not conclude that a change in permanency from reunification to adoption was warranted based on the record before it at the permanency hearing, it should have issued a timely permanency order maintaining reunification as the permanency goal. Such an order would not preclude a future change in permanency, and it would have provided the parties clarity concerning the court's expectations and avoided the con-

fusion that ensued when the court took the permanency question under advisement for several months.[4]

[¶31] The delays in this case were unacceptable and contrary to the child's best interests. *SAS v. Dep't of Family Servs. (In re AGS)*, 2014 WY 143, ¶ 17, 337 P.3d 470, 476-77 (Wyo. 2014) (When delays occur in a child protection case, "it is the children who suffer by remaining in a state of flux and uncertainty."); *see also DH v. Wyo. Dep't of Family Servs. (In re "H" Children)*, 2003 WY 155, ¶ 93, 79 P.3d 997, 1021 (Wyo. 2003) (Golden, J., dissenting) ("Time is of the essence. Do it."). The delay in adjudication is particularly troubling. We have observed that the purpose of the 90-day deadline for holding an adjudicatory hearing is "obviously, to ensure a relatively speedy resolution of child protection matters to reduce the amount of uncertainty in the child's life and prevent an undue infringement on the constitutionally protected parent-child relationship." *In re DSB*, 2008 WY 15, ¶ 23, 176 P.3d 633, 638 (Wyo. 2008). A prompt adjudicatory hearing will not serve this goal of a quick start off the blocks if that hearing is followed by a several-month delay in issuing the adjudication and disposition orders.

[¶32] Despite our concern with the delays in this matter, we need not address Mother's resulting due process claims because we agree with the State that Mother waived those claims. We have said:

> The right to due process can be waived. *Wright*, 983 P.2d at 1232; *Jones v. Jones*, 903 P.2d 545, 548 (Wyo.1995). *See also D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 184–187, 92 S.Ct. 775, 781–83, 31 L.Ed.2d 124 (1972), citing *National Equipment Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–316, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) and *Boddie v. Connecticut*, 401 U.S. 371, 378–379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). A waiver occurs when there is an intentional relinquishment of a known right manifested in an

---

4. The Child Protection Act contemplates an ongoing review of permanency:

The court shall conduct a permanency hearing no later than twelve (12) months from the date of the child's removal from the home and not less than once every twelve (12) months thereafter if the child remains in out-of-home placement or more frequently as deemed necessary by the court.

Wyo. Stat. Ann. § 14-3-431(d) (LexisNexis 2017).

unequivocal manner. *Cathcart v. Meyer*, 2004 WY 49, ¶ 21, 88 P.3d 1050, 1060 (Wyo.2004); *Jensen v. Fremont Motors Cody, Inc.*, 2002 WY 173, ¶ 16, 58 P.3d 322, 327 (Wyo.2002). While the intent to waive may be implied from conduct, the conduct should speak the intent clearly. *Id.* Silence or delay in asserting a right without more does not constitute the unequivocal manifestation of intent required for a claim of waiver. *Jensen*, ¶ 20, 58 P.3d at 327–28. To support a claim of waiver there must be an obligation to speak or the silence or inaction must be of such duration that is shows an intent to yield a known right. *Id.*

*Verheydt*, ¶ 24, 295 P.3d at 1251.

[¶33] The waiver of a claimed error differs from the forfeiture of a claimed error. "A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve." *Toth v. State*, 2015 WY 86A, ¶ 45, 353 P.3d 696, 710 (Wyo. 2015) (quoting *Wood v. Milyard*, 566 U.S. 463, 132 S.Ct. 1826, 1832 n. 4, 182 L.Ed.2d 733 (2012)). "[A] party that has *forfeited* a right by failing to make a proper objection may obtain relief for plain error; but a party that has *waived* a right is *not* entitled to appellate relief." *Id.* (emphasis in original) (quoting *United States v. Cruz–Rodriguez*, 570 F.3d 1179, 1183 (10th Cir. 2009)).

[¶34] The order that Mother claims was entered in violation of her due process rights was the juvenile court's order changing permanency from family reunification to adoption. During the final review hearing, however, Mother herself advocated the same change in permanency. Mother's attorney advised the court:

> * * * [M]y client has supported adoption with * * * the prior foster parents. * * *
>
> I do believe [Mother] has a statutory right to weigh in on the adoption. She has residual parental rights, which includes specifically under the statute the right to consent or participate in an adoption. She's made her requests clear.

[¶35] We find Mother's position, which plainly advocated adoption as the permanency goal, to be an unequivocal expression of her intent to yield any right to reunification as the permanency goal. We therefore need not address whether the delays in this matter and the juvenile court's permanency ruling infringed on Mother's due process rights.

### B. Mother's Remaining Claims Regarding Permanency Ruling

[¶36] Mother's remaining claims concerning the permanency order are: 1) the order was inadequate because it failed to make statutorily required findings with specificity; 2) the order was inadequate because it failed to designate the adoptive parents; and 3) the order was not supported by sufficient evidence. We conclude that Mother waived her first and third arguments, and we reject her second argument.

[¶37] As we previously discussed, Mother waived her due process claims when she advocated a permanency goal of adoption. The same principle applies with respect to Mother's challenges to the adequacy of the juvenile court's permanency findings and the evidentiary support for the permanency order. Mother has agreed to adoption as the permanency goal and having so agreed, Mother has waived any claim that the court's findings and the record do not support a change of permanency from family reunification to adoption.

[¶38] We take a different view of Mother's claim that the permanency order should have designated her preferred adoptive parents as the court-ordered adoptive parents. This argument is not a challenge to the change in permanency from reunification to adoption but is instead a claim that the juvenile court's failure to designate the adoptive parents of her choosing impermissibly infringed on her residual parental rights. Mother's agreement to a permanency goal of adoption was not a waiver of this argument, and we will therefore address the argument.

[¶39] The Child Protection Act defines residual parental rights and duties. It states:

> "Residual parental rights and duties" means those rights and duties remaining with the parents after legal custody,

guardianship of the person or both have been vested in another person, agency or institution. Residual parental rights and duties include but are not limited to:

 (A) The duty to support and provide necessities of life;

 (B) The right to consent to adoption;

 (C) The right to reasonable visitation unless restricted or prohibited by court order;

 (D) The right to determine the minor's religious affiliation; and

 (E) The right to petition on behalf of the minor.

Wyo. Stat. Ann. § 14-3-402(a)(xvi) (Lexis-Nexis 2017).

█ [¶40] As this definition indicates, residual parental rights are those rights a parent retains when legal custody of their child is vested elsewhere. Those rights are lost only when an order is entered terminating the parent-child relationship. Wyo. Stat. Ann. § 14-2-317 (LexisNexis 2017). Although the juvenile court's permanency order changed the permanency goal to adoption, it did not change legal custody of L-MHB. This was confirmed by the court's order following its final review hearing, which directed that legal custody remain with the State and physical placement remain foster care. The permanency order did not terminate Mother's parental rights or change legal custody of L-MHB and thus did not affect or otherwise infringe on Mother's residual parental rights.

█ [¶41] We also reject Mother's argument that the order was required to address Mother's preferred adoptive placement. The Child Protection Act requires the juvenile court to address permanency with the following findings:

(k) At the permanency hearing, the court shall:

 (i) Determine whether the permanency plan is in the best interest of the child and whether the department of family services has made reasonable efforts to finalize the plan;

 (ii) Order the department of family services to take any additional steps necessary to effectuate the terms of the permanency plan;

 (iii) Ask the child about his desired permanency outcome if it is determined that the child should be present at the hearing;

 (iv) Ask the child's guardian ad litem or other legal representative about the child's desired permanency outcome if it is determined inappropriate for the child to be present at the hearing;

 (v) If the permanency plan is classified as another planned permanent living arrangement:

  (A) Make a judicial determination and explain why, as of the date of the hearing, another planned permanent living arrangement is the best permanency plan for the child; and

  (B) Provide reasons why it continues not to be in the best interest of the child to return home or be placed for adoption or with a legal guardian or a fit and willing relative for purposes of guardianship or adoption.

 (vi) Require that the child be provided, to the greatest extent possible, the opportunity to participate in age appropriate or developmentally appropriate activities and experiences as defined in W.S. 14-13-101(a)(i) to promote healthy child and adolescent development consistent with W.S. 14-13-101 through 14-13-104.

Wyo. Stat. Ann. § 14-3-431(k) (LexisNexis 2017).

[¶42] The Act does not require that a permanency order include findings regarding the merits of prospective adoption applicants, or that the order give effect to Mother's adoption preference. The juvenile court therefore did not err in omitting such findings from its permanency order.

[¶43] We are at a point in these proceedings where two sets of foster parents wish to adopt L-MHB: those with whom L-MHB was placed for the first nearly eighteen months of her life; and those with whom she has been placed since September 2015. Mother has expressed a preference for the first set of foster parents. The extent to which Mother's residual parental rights will allow Mother to have a say in the adoptive parents is not, however, a question that is presently before

this Court. The district court, not the juvenile court, has jurisdiction over adoption proceedings and termination of parental rights (TPR) proceedings, Wyo. Stat. Ann. § 1-22-104(a) (adoption); § 14-2-308(a)(iv) (TPR) (LexisNexis 2017), and we do not as of yet have a district court ruling. Until there is a TPR or adoption ruling, it would be premature for this Court to consider the weight of Mother's adoption preference.

## CONCLUSION

[¶44] Although this Court is troubled by the delays in this neglect proceeding, we conclude that Mother waived her due process and other claims relating to the change in permanency from reunification to adoption when she advocated the same change in permanency. Additionally, because determination of the adoptive parent(s) is a matter for a separate proceeding, we find no abuse of discretion in the juvenile court's refusal to designate the adoptive parents in the permanency order. Affirmed.