2012 WY 100

**In the Matter of the Termination of Parental Rights to KMO, DMO, CMO, and AKO, Minor Children.**

**PRG, Appellant (Respondent),**

v.

**State of Wyoming, Department of Family Services, Appellee (Petitioner).**

No. S–11–0225.

Supreme Court of Wyoming.

July 23, 2012.

See also, 280 P.3d 1203.

Representing Appellant: Cindi Wood, Casper, WY.

Representing Appellee: Gregory A. Phillips, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Sue Chatfield, Senior Assistant Attorney General.

Guardian ad Litem: Cynthia K. Sweet, Casper, WY.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

HILL, Justice.

[¶ 1] PRG (Father) appeals the district court's order following a jury verdict terminating his parental rights to his four minor children. Father contends that the district court erred when it refused to use his proposed jury verdict form. He also claims that the State of Wyoming, Department of Family Services (DFS) presented insufficient evidence to terminate his parental rights and challenges the district court's denial of his motion for a judgment as a matter of law. We affirm.

## ISSUES

[¶ 2] Father presents three issues for our consideration:

I. Did the district court err in refusing [Father's] proposed Jury Verdict Form requiring the jury to consider the father's fitness in relation to each minor child.

II. Whether the evidence presented was sufficient to allow the [Father's] parental rights to be terminated as to the four minor children at issue.

III. Whether the trial court erred in failing to grant [Father's] Motion for Judgment as a Matter of Law in Jury Trials, W.R.C.P. Rule 50(a).

## FACTS

[¶ 3] Father is the biologic father of six children, two of whom are no longer minors

and are not part of this termination action, and four minor children who are the subject of this termination action: KMO, born December 10, 1995; DMO, born December 12, 1997; CMO, born June 5, 1999; and AKO, born September 6, 2001. The children's mother is HJO (Mother).

[¶ 4] This family has a long history with DFS and the juvenile court. Because this case turns in part upon on an ongoing pattern of neglect, we outline that history in some detail. Additional pertinent details will be reviewed as we address Father's specific arguments. DFS first had contact with the family in March of 1999 when DFS received a referral from the State of Nevada about a family moving to Wyoming and in need of services. At that time, there were four children and Mother was pregnant with Father's fifth child. Mother lived in Seton House in Casper, Wyoming, while Father lived in his van parked out front. DFS was informed that Nevada's Child and Family Services had substantiated allegations of neglect against Mother four times between 1996 and 1999, including physical neglect and medical neglect and lack of supervision. After receiving the intake request from Nevada, Wyoming DFS offered services to the family and implemented a voluntary case plan offering a variety of services.

[¶ 5] In May of 2001 the children were first placed into the protective custody of the State of Wyoming when Mother reported contemplating suicide by driving off of Casper Mountain with her children in the car. By then, Mother and Father had five children ranging in age nine years to as young as twenty-three months and Mother was pregnant with Father's sixth child. The district attorney filed a neglect petition and the children were placed in foster care. Father was not a placement option because he did not have a place to stay. Mother admitted the allegations of the neglect petition and in July of 2001 the children were returned to her custody, although they remained in the legal custody of DFS.

[¶ 6] In November of 2002 the children were again placed in protective custody. This time the allegations of neglect were against both Father and Mother. In order to go to work, Father had left his eight-year-old son alone to babysit his four younger siblings, including a fourteen-month old baby. The house was in disarray, raising health and safety concerns. At the same time, Mother was being arrested at Walmart for shoplifting, accompanied by her ten-year-old daughter. Subsequently, DFS substantiated allegations of lack of supervision against Father and neglect against Mother, and both parents were placed on the child abuse and neglect central registry.

[¶ 7] In May of 2003 the children were placed into the protective custody of the State of Wyoming for the third time. In this case, DFS again received a report that Mother's home was unclean and unsafe and that the six children whose ages ranged from eleven years to twenty months old had been left without appropriate supervision. Father was at work and Mother had not returned from an out-of-town trip. DFS substantiated allegations of neglect against both Father and Mother based upon the family history of inadequate and unsafe living conditions, the current condition of the home, and the continued lack of supervision. A neglect petition was filed and the children were again placed in foster care. One component of the case plan required a stable living environment before DFS could return the children home. DFS contracted with LifeNet Services for Father to assist him with obtaining a residence big enough to house his six children; however, Father did not follow through. In addition, Father made it known that it was never his primary goal to be the placement for his children and that he wanted his children to live with Mother. By March of 2004 Mother had her seventh child whose father was MBK (Father # 2),[1] and Father's six children had returned to Mother's custody. Father was not living in the home when the children returned.

[¶ 8] This case remained open after the children returned home in order to assist the family with continuing issues of safety and the cleanliness of the home, as well as the children's hygiene and tardiness at school.

---

1. Mother has a total of eleven children; MBK is the father of her five youngest.

In early 2004, DFS discovered that Mother had developed a friendship with a registered sex offender, Timothy Adams. The DFS social worker warned Mother of this and advised that she was not to have the children around Adams. Nevertheless, Mother continued to allow Adams to have contact with the children in the summer and fall of 2004 at his home and at Mother's home, and she allowed Adams to take her and Father's six-year-old daughter on an overnight trip to Cheyenne. DFS substantiated allegations of abuse against Mother for her part in allowing the children to be exposed to a known sex offender. Father knew of Adams and his sex offender status but did not take any action to remove the children from Mother's home. Adams later was charged with and pleaded guilty to taking indecent liberties with three of Father's children (including his oldest daughter, who is not part of this action). Shortly after disclosing the abuse by Adams, Father's nine-year-old daughter began intentionally pulling her hair out, resulting in a bald spot that was noticed by school personnel. Medical personnel determined that she had a rare condition called Trichotillomania, which is an unhealthy coping mechanism to relieve anxiety and which is primarily caused by extreme stress.

[¶ 9] Between 2004 and late 2007 the children remained in Mother's custody and DFS had little direct contact with the family. However, in November of 2007 DFS received a report from a school counselor alleging that the oldest daughter was not in school because she was required to stay home and take care of her younger siblings. At that time, the family consisted of nine children who ranged in age from sixteen years to thirteen months, and Mother was pregnant with twins. As part of the ensuing investigation, DFS continued to gather information from various sources and review the past abuse and neglect history of the family. The records and reports had been relatively constant and concerning. School records indicated that the children's hygiene was lacking. They often wore improper clothing for the weather, came to school hungry, and had poor academic performance. The schools had meetings with Mother about various issues including absences and tardiness and the children not being picked up on time. The children who wore prescription glasses habitually did not bring or wear them to school. Father's younger children attended the Child Development Center (CDC), a facility that works with pre-school aged children with speech, physical, and cognitive delays. CDC's description of the younger children was similar to the school reports concerning the school-aged children. During this time frame there were also several police visits to the home for reports of unattended or unsupervised children.

[¶ 10] In February of 2008, Mother forgot to pick up her four-year-old son from CDC. DFS investigated and substantiated neglect against Mother. DFS then learned that Mother had received an eviction notice from her landlord, Housing Alternatives Incorporated, which provided HUD regulated low-income housing. The eviction was based upon the unclean, unsanitary, and unsafe condition of the home. Prior to the April 1 deadline to vacate the house, Mother's four-year-old son started a fire while playing with a lighter in a basement closet causing $48,000.00 worth of damage. The family was forced to vacate the home immediately.

[¶ 11] When DFS learned of the fire, the children were placed into protective custody for the fourth time, and the juvenile case culminating in this termination action began. DFS substantiated allegations of neglect against both Mother and Father based upon the conditions of the home as reported by a paramedic who responded to the fire and the growing concerns for the safety of the children due to lack of supervision and ongoing neglect. Mother, Father, and Father # 2 stipulated to the adjudication of the children as neglected and the eleven minor children were placed in foster care. At that time, Father lived in a one-bedroom apartment with two roommates, one of whom was a registered sex offender, and his home was not appropriate for his six minor children. The juvenile court ordered a permanency plan for the children of reunification. As part of the reunification plan, the three parents determined that they would be equal co-parents with the idea that the children would

go home to Mother, Father would be involved as a parent who did not live there, and Father # 2 would be involved as a parent who did live there.

[¶ 12] By May of 2009 Father's two youngest children moved from foster care back into Mother's home. By then, the twins had already been moved back into the home and soon thereafter, Father # 2's oldest child was also back in the home. This trial home placement was not successful. By the fall of 2009 DFS received reports that the children were coming to school late, dirty, hungry, without prescription eyeglasses, and that Father's two sons were not receiving prescribed medications for ADHD. By the end of October, the five children in Mother's home were removed based upon safety and risk assessments and once again placed in foster care.

[¶ 13] During this investigation, DFS learned that Father's two youngest sons were engaging in inappropriate sexual behavior with each other, a sibling, and neighbor children. This behavior had been ongoing since March of 2009 and despite an attempt to implement a safety plan when the children were placed in Mother's home, this behavior only increased during the trial home placement and occurred on at least one occasion when both Mother and Father were home. Both boys have several mental health diagnoses, including major depressive disorder, post-traumatic stress disorder, victim of neglect, and victim of sexual abuse, and along with their younger brother (Father # 2's oldest son) have been determined to have a traumatic sexual bond stemming from Adams' sexual abuse.

[¶ 14] In March of 2010 the juvenile court determined that Mother had not made sufficient progress on her case plan to justify continuing efforts at reunification of the children with her. The juvenile court ordered continued reunification efforts with Father and Father # 2, giving them ninety days to make significant progress on their case plans. Father's updated case plan required that he meet his children's basic needs-ob-

tain appropriate housing large enough for the children of different genders to have different bedrooms, obtain appropriate transportation for all his children, show financial stability, actively participate in the children's education, make a safety plan to protect the children from sex offenders, and participate in counseling. By June of 2010 the juvenile court determined that Father had not made significant progress toward completing his case plan and in August the court ordered that the permanency goal be changed to termination of parental rights and adoption for Father's four youngest children.[2]

[¶ 15] DFS filed a petition to terminate Father's parental rights on December 7, 2010. A three-week jury trial was held between April 18, 2011 and May 6, 2011; the trial to terminate Father's and Mother's parental rights was held simultaneously. Each of the parents had separate legal counsel. The jury returned a verdict finding that Father's parental rights to his four children should be terminated and the district court entered its order terminating Father's parental rights on June 6, 2011.[3] This appeal followed.

## DISCUSSION

*Sufficiency of the Evidence*

[¶ 16] We turn first to Father's contention that DFS presented insufficient evidence at trial to support termination of his parental rights. The right to associate with one's family is fundamental, and this Court strictly scrutinizes petitions to terminate a parent's rights to his or her children. *TMC v. Dep't of Family Servs. (In re ARC)*, 2011 WY 119, ¶ 14, 258 P.3d 704, 708 (Wyo.2011). DFS must establish by clear and convincing evidence the grounds for termination. Wyo. Stat. Ann. § 14–2–309(a) (LexisNexis 2011). Clear and convincing evidence is the kind of proof that would persuade a trier of fact that the truth of the contention is highly probable. *LS v. Johnson County Dep't of Family Servs. (In re CS)*, 2006 WY 130, ¶ 7, 143 P.3d

---

**2.** The two oldest children had permanency plans of independent living and guardianship. Both have now reached the age of majority.

**3.** The jury also found that Mother's parental rights to her nine children should be terminated and the district court entered its order terminating her rights on June 6, 2011.

918, 921 (Wyo.2006). When a party challenges the sufficiency of the evidence supporting termination, we apply our traditional principles of evidentiary review. "We examine the evidence in the light most favorable to the party prevailing below, assuming all favorable evidence to be true while discounting conflicting evidence presented by the unsuccessful party." *TMC*, ¶ 13, 258 P.3d at 708.

[¶ 17] The jury based its decision to terminate on Wyo. Stat. Ann. § 14–2–309(a)(v) (LexisNexis 2011), which provides:

§ 14–2–309. **Grounds for termination of parent-child relationship; clear and convincing evidence.**

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence.

. . . .

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

The first element of § 14–2–309(a)(v) required DFS to prove that the children had been in foster care under the responsibility of the State of Wyoming for fifteen of the most recent twenty-two months. The record is clear that at the time of trial in April of 2011, none of the children had been in the home since the five younger children were removed from Mother's custody on October 30, 2009. Thus, all of the children were in foster care under the responsibility of the State of Wyoming for at least seventeen months at the time of trial. Father does not dispute this but he contends that his children's placement in foster care was through no fault of his own. Father argues that the circumstances surrounding the foster care placement—specifically, DFS's failure to pursue relative placement and/or reunification with Father—should negate the factual finding that the children were in placement for fifteen of the most recent twenty-two months.

[¶ 18] Father cites no legal authority in support of this proposition, and we find it to be without merit. Section 14–2–309(a)(v) requires only that the children have been in foster care under the responsibility of the State of Wyoming for fifteen of the most recent twenty-two months. The plain language of the statute requires no more. We discussed a similar argument concerning subsection (a)(i) of Wyo. Stat. Ann. § 14–2–309 in *EBH v. Hot Springs Dep't of Family Servs. (In re IH)*, 33 P.3d 172 (Wyo.2001), noting that "[w]hen a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction." *Id.*, ¶ 17, 33 P.3d at 181. In *EBH* we concluded that the plain language of § 14–2–309(a)(i) required no specification of fault or explanation for why the child had been left in the care of another person and hence, none was required. The same analysis applies to § 14–2–309(a)(v). No justification or explanation as to why a child was placed in foster care is required in a termination proceeding brought on these grounds. Here, DFS proved by clear and convincing evidence that all four of Father's children were in foster care under the responsibility of the State for fifteen of the most recent twenty-two months at the time of trial and thus satisfied the first element of § 14–2–309(a)(v).

[¶ 19] The second element of § 14–2–309(a)(v) requires DFS to prove by clear and convincing evidence that Father was "unfit to have custody and control" of the children. Father argues that the neglect actions prior to 2008 are too remote in time to be relevant, that he was not responsible for the conditions that led to the adjudication of neglect in 2008, and that there was no evidence that he was unfit at the time of trial.

[¶ 20] The term "unfit" is not defined in the termination statutes but we have previously recognized:

[T]he determination of whether a parent is unfit to have care and custody of a child must be made within the context of a particular case and will depend upon the situation and attributes of the specific par-

ent and child. Looking at our cases, we are able to extrapolate that fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child. *See CDB v. DJE*, 2005 WY 102, ¶ 7, 118 P.3d 439, 441 (Wyo.2005). *See also, RHF v. RMC, (In the Matter of the Adoption of JLP)*, 774 P.2d 624, 630 n. 7 (Wyo.1989) (reviewing, in a footnote, definitions of unfit from other jurisdictions). *RLA v. State of Wyo., Dep't of Family Servs. (In re LA)*, 2009 WY 109, ¶ 14, 215 P.3d 266, 269 (Wyo.2009). It is well-settled that a parent's fitness is to be determined at the time of the termination trial. *AJJ v. State (In re KMJ)*, 2010 WY 142, ¶ 17, 242 P.3d 968, 971 (Wyo.2010). "That does not mean, however, that the district court must ignore evidence of a parent's previous unfitness." *Id.* This Court recently reiterated that "[i]t is appropriate for a district court to consider a parent's history and pattern of behavior over time in determining whether rights should be terminated." *JLW v. CAB (In re WDW)*, 2010 WY 9, ¶ 24, 224 P.3d 14, 20 (Wyo.2010) (citations omitted). Evidence of past behavior is "plainly relevant in determining current parental fitness." *JD v. State (In re AE)*, 2009 WY 78, ¶ 18, 208 P.3d 1323, 1328 (Wyo.2009).

[¶ 21] During the three-week trial, the jury heard extensive evidence of a history of neglect of these children by both Father and Mother. From the time the family moved to Wyoming in 1999 through the 2008 juvenile court action, DFS substantiated allegations of neglect against Father three times and Mother numerous times. The children were placed in the protective custody of the State on four occasions and involved in four juvenile court actions alleging neglect by Mother and/or Father resulting in numerous foster care placements of the children.

[¶ 22] This past history demonstrates that deplorable and unsafe conditions have persisted in the children's home and that Father was aware of those conditions. Father lived with Mother sporadically throughout the years. Father and Mother had two children after moving to Wyoming. Mother allowed Father to come around whenever he wanted to see his children, and evidence shows that he did spend some time in the home. Moreover, Father was directly involved in the voluntary care plan in 1999 and three of the juvenile court neglect actions. In each of those actions, the unsafe and unsanitary conditions of Mother's home were at issue.

[¶ 23] This history also reveals a clear pattern of Father's refusal or inability to be a placement option for his minor children in prior neglect actions. Father's own expert testified that he chose not to have any of his children placed with him, but instead preferred placement with Mother. Many of the school personnel who testified reported they had never been contacted by Father regarding his school-aged children. Father's early and prolonged disinterest in placement or day-to-day parenting of his children is certainly relevant to his current fitness to have care and custody of them.

[¶ 24] In addition to the history of neglect and unfitness, DFS also presented evidence as to Father's current circumstances and inability to meet the ongoing physical, mental, and emotional needs of his children. At the time of trial, Father continued to live in the same one-bedroom apartment (albeit without roommates) located in a neighborhood with an inordinate number of registered sex offenders. As part of his case plans in the most recent juvenile case, Father agreed to obtain a home large enough for his children. He admitted at trial that his apartment was too small for all of his children. Nonetheless, the evidence showed that other than getting on a low-income housing list and a waiting list for one apartment complex, Father took few affirmative steps to locate an appropriate home for the children.

[¶ 25] Not only was Father's home too small for his children, but Father failed to make appropriate accommodations for his youngest children so that they could safely live in the same home. These children have displayed inappropriate sexual behavior that has been described as traumatic bonding, and one of the therapists testified that it would be detrimental for them to be placed together until they are sufficiently stabilized to begin a healthy relationship not based upon sexual behavior. They have been

placed in separate foster homes, sent to different schools, and have not had visits with one another. At trial, Father expressed concern about his children but testified that his home was appropriate for the boys. His plan to keep them safe was to have "one of them . . . sleep out in the same room with [Father] and the other one would stay in the bedroom." This failure to recognize the severity of the children's needs, as well as the level of supervision the boys would need to be safe, is relevant to Father's fitness.

[¶ 26] The jury heard testimony that all of Father's minor children need therapy due to the neglect they have endured and one child requires residential treatment. Evidence was presented from the children's therapists that Father did not understand his children's serious mental health needs or support the therapeutic process. He often resisted the therapists' suggestions, presented the therapists as the enemy, and discouraged candid communication between his children and their therapists thus impeding their therapeutic progress.

[¶ 27] There was also evidence of Father's inability to provide a stable financial situation. Although Father has maintained steady employment, he did not know what his support obligation amounts are, and there was no evidence presented of the amount of monetary support he claims to provide. He has never been court-ordered to pay child support for his youngest son but with respect to the other children, he is in arrearages in excess of $70,000.00.

[¶ 28] Father points to the trial testimony that was favorable to him, including the progress he made in a relatively short time on his most recent case plan. However, it is not this Court's role to reweigh the evidence. Rather, it is the jury's responsibility to weigh the evidence, assess the credibility of the witnesses, and resolve conflicts in the evidence. *JLW*, ¶ 17, 224 P.3d at 19. Our role is to determine whether all the evidence, viewed in the light most favorable to the

prevailing party and discounting conflicting evidence, amounts to clear and convincing proof that termination is appropriate. *TMC*, ¶ 13, 258 P.3d at 708. We have carefully reviewed the extensive record in this matter applying the standards articulated at the outset of this discussion and find that the jury's verdict is fully supported by the evidence.

*Jury Verdict Form*

[¶ 29] At the conclusion of the termination trial, Father proposed a verdict form that required the jury to find the elements of § 14–2–309(a)(iii) and/or (v) as to each of his four children individually.[4] DFS proposed, and the district court submitted to the jury, a verdict form that required the jury to find the elements of § 14–2–309(a)(iii) and/or (v) as to all four children as a group. Father argues that the generalized verdict form removed from the province of the jury the obligation to make findings as to Father's fitness as to each child and, therefore, violated his due process rights to a fair and impartial trial under the Wyoming and United States constitutions.

[¶ 30] "The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness." *DH v. Wyo. Dept of Family Servs. (In re "H" Children)*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo. 2003). "The submission of . . . a particular form of special verdict is vested in the sound discretion of the trial court." *Turcq v. Shanahan*, 950 P.2d 47, 53 (Wyo.1997). We consider the verdict form together with the instructions provided to the jury. *Pauley v. Newman*, 2004 WY 76, ¶ 12, 92 P.3d 819, 824 (Wyo.2004). Reversal may only be predicated upon an abuse of the court's discretion. *Addakai v. Witt*, 2001 WY 85, ¶ 16, 31 P.3d 70, 73 (Wyo.2001).

---

4. The termination action against Father was based upon Wyo. Stat. Ann. § 14–2–309(a)(iii) and (v) (LexisNexis 2011). The jury based its decision to terminate upon § 14–2–309(a)(v). Parental rights may be terminated on a finding of

just one of the subsections enunciated in § 14–2–309. *MN v. State, Dep't of Family Servs., (In the Interest of MN)*, 2003 WY 135, ¶ 31, 78 P.3d 232, 239 (Wyo.2003).

The core of our inquiry must reach 'the question of reasonableness of the choice made by the trial court.' *Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998). 'Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' *Id.* (quoting *Byerly v. Madsen*, 41 Wash.App. 495, 704 P.2d 1236, 1238 (1985)); *Basolo* [*v. Basolo*], 907 P.2d [348] at 353 [Wyo. 1995]. We must ask ourselves whether the district court could reasonably conclude as it did and whether any facet of its ruling was arbitrary or capricious.

*Young v. HAC, LLC*, 2001 WY 50, ¶ 6, 24 P.3d 1142, 1144 (Wyo.2001) (quoting *Carlton v. Carlton*, 997 P.2d 1028, 1031 (Wyo. 2000)).

*Pauley*, ¶ 7, 92 P.3d at 822.

[¶ 31] In making its decision regarding which verdict form was most appropriate, the district court heard argument from all parties and considered the evidence presented during trial. The court articulated its reasons for presenting the chosen verdict form, noting that the evidence indicated all parties were "interested in keeping the children together if possible." The district court reasoned that there was no specific evidence presented at trial to justify treating one child differently from the others with regard to termination of Father's parental rights. We agree. The jury heard testimony about each of the children individually, but much of the evidence regarding Father's fitness related to factors that would affect all children in the household including Father's ability to provide appropriate housing and a safe environment for the children, recognize the children's mental health needs and support the therapeutic process, follow-through with the children's educational needs, and support the children financially. The court was clearly concerned about the confusion that may be caused by Father's verdict form given the nature of the evidence presented during trial:

And I understand your argument on the law and I would have been extremely sympathetic to it if there had been a specific presentation to the jury that there is absolutely no question that I can take care of child X and Y, for example. But throughout, the parents say, There is no reason to keep from us any of these kids. We want them all. So I hate to put the jury in that position, I must tell you.

This consideration was reasonable and supported the verdict form presented to the jury.

[¶ 32] It is also necessary to consider the verdict form in light of all the instructions given. *Addakai*, ¶ 22, 31 P.3d at 74. It is the duty of the district court to provide instructions to a jury which clearly express the law in a manner sufficient to allow the jury to apply the correct law to the facts as they have determined them. *Id.*, ¶ 14, 31 P.3d at 73. Jury Instruction No. 8 advised the jury to "apply the law as instructed to the facts." Jury Instruction No. 12 provided:

The term "unfit" is not defined in the termination of parental rights statutes. "Unfit" generally means unsuitable, incompetent, or not adapted or qualified for a particular use or service. Parental unfitness includes the inability to appreciate and perform the obligations required of a parent. Unfitness means the probability that the parent will fail in a substantial degree to discharge his or her parental duties towards a child. Unsuitability for any reason may render a parent unfit to have custody of their child. A failure to show a willingness to respond to the needs of a child may render a parent unfit. Fitness includes the ability to meet the ongoing physical, mental and emotional needs of the child. Whether a parent is fit to have custody and control of a child is a decision that must be made within the context of a particular case and depends upon the situation and attributes of the specific parent and child.

This is a correct statement of the law. *See AJJ*, ¶ 15, 242 P.3d at 971. There is no indication the jury made its determination regarding termination of Father's parental rights without first considering the evidence presented and the specific attributes of each

child and, as discussed in the preceding section, sufficient evidence was presented to the jury to clearly and convincingly establish that Father was not fit to have the care and custody of any of his four minor children.

[¶ 33]  In sum, reading the special verdict form together with the jury instructions, we cannot say that the form of the special verdict misled or confused the jury with respect to the applicable principles of law or was fundamentally unfair, and we find no abuse of discretion.

### Judgment as a Matter of Law

[¶ 34]  In his third argument, Father argues that the district court erred in failing to grant his motion for judgment as a matter of law pursuant to Rule 50(a) of the Wyoming Rules of Civil Procedure.  "Whether a verdict should be directed is a question of law and on those questions litigants are entitled to full review by the appellate court without special deference to the views of the trial court."  *Carey v. Jackson*, 603 P.2d 868, 877 (Wyo.1979).  The district court may enter a judgment as a matter of law against a party on any claim if the district court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.  W.R.C.P. 50(a).  In determining whether a verdict should have been directed, this Court upon review must consider the evidence favorable to the party against whom the motion is directed, giving to it all reasonable inferences.  *Id.*, 603 P.2d at 877.

[¶ 35]  A *denial* of a motion for a judgment as a matter of law is predicated on the sufficiency of the evidence.  We have already undertaken a thorough review of the evidence in this case viewing it in the light most favorable to DFS and have determined that DFS presented sufficient clear and convincing evidence to support the jury's verdict. That determination necessarily encompasses the conclusion that DFS presented sufficient evidence to submit the matter to the jury in the first place.  The district court's denial of Father's Rule 50(a) motion was not in error.

## CONCLUSION

[¶ 36]  The special verdict form given to the jury was appropriate and the district court did not abuse its discretion in refusing Father's proposed verdict form.  DFS presented sufficient evidence for this matter to be submitted to the jury and clear and convincing evidence supported the jury's verdict and the district court's order terminating Father's parental rights to his four minor children.  Affirmed.