# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 1

### OCTOBER TERM, A.D. 2019

### January 2, 2020

IN THE MATTER OF THE
TERMINATION OF PARENTAL
RIGHTS TO: L-MHB, minor child,

DENISE LYNN METS,
f/k/a DENISE LYNN
FENSTERMACHER,

Appellant
(Respondent),

v.                                                              S-19-0079

STATE OF WYOMING, DEPARTMENT
OF FAMILY SERVICES,

Appellee
(Petitioner).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
> Tyler J. Garrett and Katie J. Koski, Hathaway & Kunz LLP, Cheyenne, Wyoming. Argument by Ms. Koski.

*Representing Appellee:*
> Bridget Hill, Wyoming Attorney General; Misha Westby, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Wendy S. Ross, Senior Assistant Attorney General. Argument by Ms. Ross.

*Guardians ad Litem:*
> Dan Wilde, Deputy State Public Defender; Joseph R. Belcher, Chief Trial and Appellate Counsel, Wyoming Guardian ad Litem Program, a division of the Office of the State Public Defender. Appearance by Mr. Belcher.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**GRAY, Justice.**

[¶1]    Denise Lynn Mets (Mother) appeals the district court order terminating her parental rights.  A jury returned a verdict finding clear and convincing evidence for termination on two separate statutory grounds, Wyo. Stat. Ann. § 14-2-309(a)(iii) (parental neglect of the child and reasonable efforts to rehabilitate the family unsuccessful) and Wyo. Stat. Ann. § 14-2-309(a)(v) (child in foster care fifteen of the most recent twenty-two months and parent unfit to have custody).  *See infra* ¶¶ 17–18.  The district court entered its order terminating parental rights on February 8, 2019.  Mother contends the district court abused its discretion when it admitted privileged evidence through physician testimony and an associated medical record.  We affirm.

## ISSUE

[¶2]    Was Mother prejudiced by the admission of her physician's testimony or the related 2011 medical record?

## FACTS

[¶3]    Mother gave birth to L-MHB on April 15, 2014, and, almost immediately, the child was placed in protective custody because of concerns that Mother posed a danger to the child and was unable to properly care for her.  *In Interest of L-MHB*, 2017 WY 110, ¶ 1, 401 P.3d 949, 951 (Wyo. 2017).  Shortly thereafter, the Department of Family Services (DFS) filed a neglect petition in the juvenile court and L-MHB was placed in foster care. *Matter of Adoption of L-MHB*, 2018 WY 140, ¶ 3, 431 P.3d 560, 563 (Wyo. 2018).  The juvenile court adjudicated L-MHB neglected.  *In Interest of L-MHB*, ¶¶ 11–12, 401 P.3d at 953.  Initially, the permanency goal was reunification but eventually changed from reunification to adoption.  *Id.* ¶¶ 13–14, 20, 401 P.3d at 954, 956.  Mother appealed that decision and it was affirmed.  *Id.* ¶ 44, 401 P.3d at 962.  DFS filed a petition to terminate Mother's parental rights on May 3, 2017.  In January 2019, a five-day trial resulted in a jury determination that clear and convincing evidence existed to support terminating Mother's parental rights.

### Relevant Procedural Background: Dr. Collison and the Cheyenne Regional Medical Center (CRMC) Motion to Quash

[¶4]    Prior to trial, DFS issued subpoenas for several CRMC employees, including Dr. Jason Collison.[1]  CRMC moved to quash those subpoenas based upon the Wyoming Hospital Records Act and Mother's refusal to consent to the testimony.  In a prior

---

[1] DFS designated thirteen potential expert witnesses.  Most of these, including Dr. Collison, had previously provided treatment to Mother.

juvenile court action, *In Interest of L-MHB*, Mother had signed a release giving her juvenile action attorney access to her medical records, including records from 2011 when she was under the supervision of Dr. Collison. In addition to Mother's release to her attorney, the juvenile court in that proceeding had also ordered Mother to release her psychological records to DFS and the guardian ad litem (GAL). *In Interest of L-MHB*, ¶¶ 12–13, 401 P.3d at 954. Mother produced these records to DFS through her attorney. In 2014, Mother expressly revoked "any further release of medical records" previously granted to DFS. In 2015, Mother executed a separate release in favor of DFS for Dr. Kenneth Bell, a psychologist.

[¶5]   On the first day of the 2019 termination trial involving L-MHB, DFS responded to CRMC's motion to quash, asserting Mother had waived any claims of privilege because her attorney in the preceding juvenile neglect case had provided Mother's medical records to DFS. CRMC withdrew its motion. Mother did not separately object in writing to potential CRMC witnesses identified by DFS, including Dr. Collison.

**Dr. Collison's Testimony and Exhibit 8**

[¶6]   Dr. Collison testified on the second day of the trial. At the commencement of his testimony, Mother objected, asserting the physician-patient privilege. Mother claimed she had consistently refused to sign a release of medical records. DFS assured the district court that it had an express release from Mother authorizing disclosure, and that these medical records had been previously produced in the separate juvenile action. DFS claimed that Mother's prior release amounted to a complete release and waiver of the CRMC medical records, including Dr. Collison's testimony. The district court overruled Mother's objection.

[¶7]   Dr. Collison did not recall when he first encountered Mother, and DFS counsel introduced Exhibit 8—an August 6, 2011 history and physical report prepared by Dr. Collison. Mother objected to the report, asserting privilege, and the district court overruled the objection.

[¶8]   Dr. Collison testified that Mother was admitted to CRMC Behavioral Health Services in 2011 because of a "suicide attempt." At that time, Mother was "agitated" and was given medications to control her behavior and her potassium levels. Dr. Collison was "unsuccessful" in gathering information from Mother because she "refused" to talk to him, and he documented that he had "limited information." He noted the crisis therapist reported that Mother had been living in a park and that Mother's insight and judgment appeared to be poor. His assessment was that she had "depressive disorder not otherwise specified." He "rated her suicide risk . . . as high due to the recent suicide attempt." He had no recollection of when Mother was released and no recall of any interactions with Mother during her stay because "[i]n all likelihood" the regular inpatient attending physician (and not Dr. Collison) would have been her doctor during her

hospitalization. Dr. Collison also had no recollection of Mother's January 2013 admission to CRMC Behavioral Health Services. He had no recollection of how many times he saw Mother, but had documentation of seeing her only once, in 2011. He testified generally about the symptoms of depression, what it means to have poor insight and judgment, and the definition of dysphoric mood and labile behavior.[2] Dr. Collison's actual testimony, excluding the privilege objections and rulings, comprises less than fifteen pages of the 1156-page trial transcript. Exhibit 8 is a two-page history and physical report. It documents Dr. Collison's interaction with Mother and contains the same information as Dr. Collison's testimony.

**Overview of Other Evidence**

[¶9]     DFS called a total of seventeen witnesses at trial. DFS presented other evidence of Mother's mental health issues and her past and ongoing failures to address her mental health needs, obtain counseling, or take prescribed medications. DFS presented evidence that Mother continually failed to cooperate with reunification efforts, ignored her case plan and its requirements, and threatened DFS caseworkers. She did nothing to create or maintain a bond with L-MHB. DFS also presented evidence that Mother struggled in many areas of her life: she had constant conflict with neighbors, DFS, healthcare providers, romantic interests, her eventual husband Sean Mets (Mr. Mets), and Mr. Mets's family. She frequently lived in inappropriate, dangerous, or unclean housing. Her younger children were "unkempt" and "odorous" at the time of trial. Her home at the time of trial was messy and unsanitary. She and Mr. Mets had repeated encounters with law enforcement officers in Cheyenne, Casper, and South Dakota. In addition to Mother's history and current issues, DFS presented evidence of Mr. Mets's past and continuing violent nature and the associated safety concerns for L-MHB. This evidence is discussed in more detail later in this opinion.

**Jury Verdict and the Current Appeal**

[¶10]  Following trial, the jury returned a verdict finding clear and convincing evidence that grounds existed to terminate Mother's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v). The district court concluded that it was in the best interests of L-MHB to terminate Mother's parental rights and entered its order on February 8, 2019. Mother timely appeals.

---

[2] Dr. Collison explained: "Dysphoric typically is a description of someone's outward expression of mood. That might be someone's facial expression appearing sad." He characterized labile behavior as "typically mean[ing] that one's affect or expression of mood is quick to change, or unpredictable."

*DISCUSSION*

***Was Mother prejudiced by the admission of her physician's testimony or the related 2011 medical record?***

[¶11]  Mother argues that the district court abused its discretion when it admitted her medical record from three years prior to the birth of L-MHB and in allowing Dr. Collison to testify.  DFS argues that Mother waived the physician-patient privilege.  Our review of the record uncovered an abundance of evidence in support of termination.  Little purpose would be served in tracing the complicated history of Mother's releases, revocation of releases, and claims of waiver and privilege because, even if the district court erred in admitting privileged information, Mother suffered no prejudice.

**A.    Standard of Review**

[¶12]  The district court's decision on the admission of evidence is reviewed for an abuse of discretion.  *Matter of GAC*, 2017 WY 65, ¶ 32, 396 P.3d 411, 419 (Wyo. 2017).  "A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.  The appellant bears the burden of showing an abuse of discretion."  *Id.* (quoting *Wise v. Ludlow*, 2015 WY 43, ¶ 42, 346 P.3d 1, 12 (Wyo. 2015)).  To determine whether there has been an abuse of discretion, we consider "whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner."  *Gonzalez-Chavarria v. State*, 2019 WY 100, ¶ 11, 449 P.3d 1094, 1097 (Wyo. 2019) (citation omitted).

[¶13]  Even when a trial court abuses its discretion in admitting evidence, reversal is only warranted if the error was prejudicial; reversal is not warranted if the error is harmless.  *Dixon v. State*, 2019 WY 37, ¶ 40, 438 P.3d 216, 231 (Wyo. 2019).  "An error is deemed prejudicial when there is a reasonable probability that, in the absence of the improper evidence, the verdict would have been more favorable to the appellant."  *Swett v. State*, 2018 WY 144, ¶ 12, 431 P.3d 1135, 1140 (Wyo. 2018) (citations omitted); *see also Lauderman v. State, Dep't of Family Servs.*, 2010 WY 70, ¶¶ 16–17, 232 P.3d 604, 609 (Wyo. 2010).

**B.    Analysis**

[¶14]  Mother argues that Dr. Collison's testimony and Exhibit 8 were protected by the physician-patient privilege codified in Wyo. Stat. Ann. § 1-12-101(a)(i), and the admission of this evidence prejudiced her.[3]  Here, the record shows that Mother was not

---

[3] Wyo. Stat. Ann. § 1-12-101(a)(i) provides:

prejudiced by the admission of the evidence. *Rudy v. Bossard*, 997 P.2d 480, 484 (Wyo. 2000) (foregoing analysis of whether trial court erred in admitting letter when letter did nothing more than corroborate testimony); *Lauderman*, ¶ 17, 232 P.3d at 609 (declining to analyze whether trial court erred in ruling on the admissibility of evidence where mother was not prejudiced by such evidence); *MSH v. ALH*, 2012 WY 29, ¶ 7, 271 P.3d 983, 985 (Wyo. 2012) (foregoing determination of whether report was admitted erroneously where father failed to prove that, if there was error, it was prejudicial).

[¶15] Mother argues that "[w]ithout Dr. Collison's testimony, the State never would have met its burden of proof," and "Dr. Collison's testimony and the 2011 Medical Record were necessary for the State to prove by clear and convincing evidence that Mother's parental rights ought to be terminated."

[¶16] Establishing prejudice is fact-intensive, requiring analysis of the alleged error "with reference to the entire record." *Hill v. State*, 2016 WY 27, ¶ 47, 371 P.3d 553, 566 (Wyo. 2016) (citation omitted).

> In determining whether an appellant was prejudiced by the trial errors, ***we consider the entire record***. *See, e.g.*, *Law v. State*, 2004 WY 111, ¶¶ 25–29, 98 P.3d 181, 190–91 (Wyo. 2004) (reviewing the entire record to determine if appellant was prejudiced by erroneous admission of evidence); *Wilks v. State*, 2002 WY 100, ¶ 21, 49 P.3d 975, 984–85 (Wyo. 2002) (reviewing the entire record to determine if appellant was prejudiced by improper testimony).

*Weston v. State*, 2019 WY 113, ¶ 38, 451 P.3d 758, 768–69 (Wyo. 2019) (emphasis added).

[¶17] DFS sought to terminate Mother's parental rights under Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v), which provide:

---

> (a) The following persons shall not testify in certain respects:
>> (i) An attorney or a physician concerning a communication made to him by his client or patient in that relation, or his advice to his client or patient. The attorney or physician may testify by express consent of the client or patient, and if the client or patient voluntarily testifies the attorney or physician may be compelled to testify on the same subject[.]
>
> Wyo. Stat. Ann. § 1-12-101(a)(i) (LexisNexis 2019).

(a) The parent-child legal relationship may be terminated if any one (1) or more of the following facts is established by clear and convincing evidence:

. . .

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

. . .

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child[.]

Wyo. Stat. Ann. § 14-2-309(a)(iii) and (v) (LexisNexis 2019).

[¶18]  The jury determined that there was clear and convincing evidence of both statutory grounds for termination.  On review, we need find only there was clear and convincing evidence of the elements of one ground for termination.  *Matter of ASA*, 2018 WY 5, ¶ 14, 408 P.3d 791, 794 (Wyo. 2018).  Accordingly, our analysis here will focus on termination under Wyo. Stat. Ann. § 14-2-309(a)(v), which required DFS to establish by clear and convincing evidence that: (1) L-MHB was in foster care for fifteen of the most recent twenty-two months; and (2) that Mother was unfit to have custody and control of her.[4]

[¶19]  It is undisputed that at the time of trial, L-MHB had been in foster care for fifteen of the most recent twenty-two months.  She had been in foster care for nearly five years.[5] The second element of Wyo. Stat. Ann. § 14-2-309(a)(v) required DFS to establish Mother was unfit to have custody and control of L-MHB.  A parent's fitness to parent a child "will depend upon the situation and attributes of the specific parent and child." *In re KMO*, 2012 WY 100, ¶ 20, 280 P.3d 1216, 1222–23 (Wyo. 2012) (citation omitted).

---

[4] For clarity, we address only one ground.  Notwithstanding this focus, the same facts are relevant to termination under Wyo. Stat. Ann. § 14-2-309(a)(iii). *In re A.D.*, 2007 WY 23, ¶ 12, 151 P.3d 1102, 1106 (Wyo. 2007) ("[E]vidence pertaining to whether [a child's] health and safety would be seriously jeopardized if returned to Mother [an element for termination under § 14-2-309(a)(iii)] is also relevant to the determination of whether she is unfit.").

[5] DFS took custody of L-MHB while L-MHB and Mother were still recovering at the hospital after her birth.

[¶20] "[F]itness includes the ability to meet the ongoing physical, mental and emotional needs of the child." *KMO*, ¶ 20, 280 P.3d at 1223 (citation omitted); *Matter of LCH*, 2019 WY 13, ¶ 11, 434 P.3d 100, 103 (Wyo. 2019). "[A] parent's fitness is to be determined at the time of the termination trial," but "[e]vidence of past behavior is 'plainly relevant in determining current parental fitness.'" *KMO*, ¶ 20, 280 P.3d at 1223 (citation omitted); *LCH*, ¶ 11, 434 P.3d at 103. Some of the relevant factors we have considered when evaluating fitness include: 1) "lack of contact with and expressed lack of desire to take custody of the child"; 2) "unstable living situation relating to employment or maintenance of a suitable home"; 3) "failure to take responsibility for past conduct"; 4) "lack of emotional bond with the child"; 5) "failure to develop child-rearing skills"; 6) "inability to monitor or make healthy nutritional choices or to provide a safe environment"; and 7) "a history of surrounding [oneself] and the children with unsafe individuals." *LeBlanc v. State Dep't of Family Servs.*, 2017 WY 107, ¶ 23, 401 P.3d 932, 936 (Wyo. 2017) (citations omitted).

### 1. L-MHB's Birth

[¶21] Mother gave birth to L-MHB on April 15, 2014. Mother had received inpatient treatment at CRMC Behavioral Health Services twice during her pregnancy. L-MHB's pediatrician was aware of Mother's mental health history and was concerned for the health and safety of L-MHB because during her pregnancy, Mother expressed thoughts of suicide and infanticide; indicated she used drugs; and had not followed through with mental health treatment or medication recommendations. The pediatrician placed L-MHB into protective custody immediately after her birth, and Mother was supervised while with L-MHB. On April 17, 2014, following an investigation by DFS, the State filed a petition alleging neglect.[6] The same day, the juvenile court held a shelter care hearing, which Mother and her attorney attended. Following that hearing, the juvenile court issued a shelter care order directing that legal custody of L-MHB remain with the State and that she be placed in foster care upon discharge from the hospital. *In Interest of L-MHB*, ¶¶ 4–5, 401 P.3d at 951–52.

[¶22] DFS filed a petition to terminate Mother's parental rights in 2017, and the trial began in January 2019. On the first day of trial, DFS called Jenni Nath and Peggy Rice, both registered nurses who cared for L-MHB at CRMC after she was born. Ms. Nath explained that Mother's medical history indicated that she had asked "how to harm the baby while it was still in utero" and that Mother's interactions with the baby had to be supervised. Ms. Nath recalled that when she told Mother it was time to feed the baby,

---

[6] DFS' investigation contained serious allegations that L-MHB was at risk of being harmed or killed. The investigation included observations made by doctors and nurses at CRMC and CRMC Behavioral Health Services and also Mother's own statements after L-MHB was born.

7

Mother walked out of the nursery, and Ms. Nath had to feed her. Ms. Rice testified that when she attempted to talk with Mother about using medication to stabilize her mental health, Mother got angry and said that she did not need any medication.

### 2. Events in 2014

[¶23] DFS also called Stacey Dunlay, the first caseworker assigned to the case. Ms. Dunlay testified that Mother had threatened to harm herself and L-MHB both prior to and after L-MHB's birth. Ms. Dunlay testified that during multiple conversations with Mother, she had stressed to Mother the importance of visits with L-MHB and the need to make sure Mother's mental health needs were met so that she could safely parent L-MHB. Mother had "a lot of reasons why she said she couldn't participate or wouldn't participate" in the case plan.

[¶24] Ms. Dunlay expressed concerns about Mother's unstable living situations, her involvement in abusive relationships, and her hostile relationship with L-MHB's foster parents.[7] Mother began supervised visits with L-MHB but brought a knife to the second visit. Afterward, Mother refused to work with a third party for supervised visits, and visitation ceased due to safety concerns.[8] Mother failed to accomplish the tasks needed to recommence visitation with L-MHB. Mother refused to sign the case plan. Mother threatened Ms. Dunlay and her team to the extent that Ms. Dunlay feared for her own safety.

[¶25] Ms. Dunlay discussed Mother's tendency to lie and make "off-the-wall" statements.[9] By November 2014, when Ms. Dunlay ceased working with Mother, Mother

---

[7] Mother never granted DFS access to any of the places she resided. Mother dated men who threatened or tried to kill her or threatened to kill her and L-MHB. Officer Heather Townsend of the Cheyenne Police Department, who had several interactions with Mother, testified that in June 2014, the hotel room where Mother had been living was not a safe place for a child.

[8] DFS also called Jocelyn Trujillo, who worked for a third-party contractor to supervise visits between children in DFS custody and their family members. Ms. Trujillo supervised one of Mother's two visits with L-MHB in April 2014. During the drive to the visit, Mother told Ms. Trujillo that her family had a farm and knew how to clean up crime scenes. Mother detailed how to get away with the "perfect murder" using pigs to eat the victims' bodies and goats to eat the victims' clothing. The conversation alarmed Ms. Trujillo. On their way home, Mother complained about DFS and said, they "were messing" with "the wrong family." Mother stated she was in a "south side gang," and that she was Wiccan and was going to get a Wiccan tattoo so that "everybody in court and everybody knew who they were messing with." Ms. Trujillo testified that the discussions caused her to fear for her own safety, and she refused to supervise more visits with Mother.

[9] For example, at times, Mother would describe prior treatment or diagnoses and then later in the conversation would say, "that's not true, I lied." Ms. Dunlay estimated that Mother made false statements in "90 percent of the[ir] conversations." Mother also accused the staff at the hospital of falsifying records, described incidents where her friends saw someone exchange money with the doctor who put L-MHB in protective custody, and told Ms. Dunlay that her ex-boyfriend had purchased weapons to kill

was less cooperative than she had been initially. Ms. Dunlay testified they had been unable to establish that Mother did not pose a danger to herself or L-MHB, they had not reestablished visitation, and Mother had not followed the case plan.

[¶26] Mother married Mr. Mets in September 2014. She and Mr. Mets moved to Casper the following month. Athena Loftus was the caseworker assigned to Mother's case after she moved to Casper. Early in Ms. Loftus's involvement, Mother had asked DFS to move the case to the Casper area from Cheyenne because, she stated, "there was no way in hell she was going to be traveling to Cheyenne in order to work on the reunification efforts." Ms. Loftus testified that she found providers and services for Mother in Casper which would have enabled Mother to comply with the case plan.

### 3. Events in 2015

[¶27] Mother missed scheduled meetings and appointments with providers. Mother refused to provide her address in Casper and failed to notify Ms. Loftus when she moved back to Cheyenne for a brief period.[10]

[¶28] Ms. Loftus also set up urinalysis testing for Mother in Casper. Mother refused that testing, claiming she was unavailable because she was working two jobs and had transportation issues. Ms. Loftus told Mother that DFS would pay for transport to her urinalysis testing and other services. Mother still refused.

[¶29] Ms. Loftus expressed concerns about Mother's husband, Mr. Mets. She testified that at multidisciplinary team (MDT) meetings, Mr. Mets "would grow very agitated, his voice would rise, and he would sound very aggressive." In approximately July 2015, Ms. Loftus learned that Mr. Mets had assaulted Mother. After the assault, Ms. Loftus again attempted to visit the Mets's home, and Mother told her that Mr. Mets would not allow her to visit.[11] Mr. Mets's behavior caused Ms. Loftus concern for L-MHB's safety if she were to be returned to Mother. Mother and Mr. Mets threatened Ms. Loftus throughout the case.[12] Mother threatened to sue Ms. Loftus more than once and told her that she knew her home address and her family members.

---

her, her baby, and "everyone from the judge on down." Ms. Dunlay described these conversations as "standard."

[10] Mother and Mr. Mets returned to Cheyenne for roughly ten days in February 2015. While Mother was in Cheyenne, she did not request visits with L-MHB.

[11] Corporal Matthew Vincent of the Mills Police Department testified that the Mets's home in Casper "was a health hazard," noting it had holes in the floor, dirty clothes scattered throughout, and was "extremely filthy."

[12] On the first day of trial, Ms. Loftus described an incident where she felt Mr. Mets intended to hit her with his van as she crossed the street. She explained,

> I saw Mr. Mets in his van at [the] corner waiting for the light to make a
> turn. We made eye contact. The light authorize[d] me to walk. I

[¶30]  Psychologist Dr. Kenneth Bell, a mental health provider, testified about his 2015 evaluation of Mother.[13]  It was difficult for him to perform a complete assessment because Mother declined to provide releases for previous treatment records.  Mother told him that she "faked most of those records."  Moreover, Dr. Bell had difficulty obtaining a history because Mother "often required repeated questions," and the history she did provide contradicted itself.

[¶31]  Dr. Bell was able to glean limited information summarized here.  Mother's mother physically abused her throughout her childhood.  Mother was placed into foster care at approximately nine years of age.  Mother remained in facilities until she graduated from high school.  She was given several psychiatric medicines and mental health therapies during that period.  Mother had a history of cutting, suicidal thinking, and illicit substance abuse—including methamphetamine—from early adolescence through April 2014.  After high school, Mother was hospitalized several times for psychiatric treatment.  During those hospitalizations, she was provided with psychotropic medications which she discontinued upon release and has not taken since 2012.  When she was not in treatment, Mother occasionally lived with her mother, her brother, and at a shelter, but was homeless for extended periods of time.  Mother had "conflictual relationships" with romantic partners, some of whom physically assaulted her.  Mother married Mr. Mets in September 2014.  They lived in various places, including with friends, in a car, and finally at Mr. Mets's parents' home in Casper, where they lived at the time of Dr. Bell's evaluation.

[¶32]  Dr. Bell diagnosed Mother with disruptive mood dysregulation disorder and "other specified personality disorders" with narcissistic borderline and antisocial disorder traits.[14]  Based on his diagnoses, Dr. Bell recommended that Mother engage in individual psychotherapy, obtain drug testing, and be evaluated by a physician to determine whether she would benefit from medication.  Dr. Bell recommended that before L-MHB could be returned to Mother's home, Mother should demonstrate stability in several areas, including emotional stability, housing, and resources.  Dr. Bell's prognosis was "guarded," and he believed Mother's motivation for treatment was "poor."  He testified

---

beg[an] walking through the walkway, and as [I was] getting closer to the court building[,] Mr. Mets increase[d] his speed to come around the corner and [was] within inches of me.

[13] Mother signed releases for Dr. Bell's written report to DFS, the guardian ad litem, and the district attorney in 2015.  At trial, Mother did not object to the admission of Dr. Bell's 2015 evaluation.

[14] Dr. Bell testified that during her interview, Mother had an angry affect, she made "tangential statements," and he had to remind her several times to put her cell phone away.  Dr. Bell performed several psychological tests which revealed that Mother has an IQ of 82, reads at the sixth-grade level, and experiences difficulties with interpersonal relationships.  She has problems with authority, stress and coping, and an "ongoing sense of irritability."

that the "long-term changes and behavior that were necessary" were "unlikely" to occur given Mother's "overall ability" and her diagnoses.

[¶33] Corporal Vincent testified he had "multiple" encounters with Mother during the time she was living with Mr. Mets and his family.[15] He testified that the Mets "family dynamics were . . . dysfunctional" and that they could not "manage any type of conversation without it turning into an argument" or "any type of controversy" without it "turning to violence."[16]

[¶34] Beginning in October 2015, Ms. Loftus recommended that the permanency goal be changed to adoption due to the lack of progress by Mother.[17] In November or December 2015, Ms. Loftus testified that Mother refused Skype visits with L-MHB because she claimed the DFS office in Casper was too far away. Mother also refused to give consent for L-MHB to have her tonsils and adenoids removed, which was necessary because without the surgery L-MHB was not able to get enough oxygen. Even after the court granted DFS' motion to allow the surgery, Mother stated she was not going to allow the surgery to happen.

### 4. Events in 2016

[¶35] In June 2016, Mother, Mr. Mets, and his family moved to South Dakota. Ms. Loftus attempted to establish services for Mother there. Ms. Loftus organized a contract for drug testing, but Mother refused to attend. Ms. Loftus also attempted to set up mental health services, but Mother failed to sign the necessary releases. Even so, Ms. Loftus located a facility where Mother could obtain mental health services. She provided Mother this option, along with information on Medicaid-paid transit. Mother "didn't want to" avail herself of the service.[18]

---

[15] On one occasion, Mother was concerned she would be physically harmed by Mr. Mets's father. On another occasion, Mr. Mets and his father had engaged in a physical altercation which resulted in domestic battery charges against Mr. Mets. On a third occasion, Mr. Mets had a "pushing match" with his father.

[16] Sergeant Josh Albrecht of the Casper Police Department also testified that he was familiar with Mr. Mets because he had been in contact with him on more than one call, including an encounter when Mr. Mets had engaged in a "fistfight" with a 17-year-old which resulted in disturbing the peace charges against Mr. Mets.

[17] As one of its final witnesses, DFS called Kevin Schei. Mr. Schei was L-MHB's Court Appointed Special Advocate (CASA). Mr. Schei attended court hearings, participated in MDT meetings, and communicated with Mother about L-MHB and the case plan. He testified that Mother was generally uncooperative and unwilling to comply with the case plan. He explained that Mother declined services offered by DFS and never asked him about L-MHB's wellbeing. Mr. Schei testified that initially he recommended that L-MHB be reunited with Mother but changed his recommendation at the "15-month mark" because of Mother's "lack of participation."

[18] On direct examination by DFS, Mother admitted that she refused to undergo evaluations and counseling

[¶36] In October 2016, Ms. Loftus developed an updated case plan for Mother.[19] Mother refused to discuss the amended case plan with Ms. Loftus. Both Mother and Mr. Mets refused to sign the amended plan. Both Mother and Mr. Mets failed to comply with the individual counseling requirement in the plan.[20] The permanency plan changed to adoption in November 2016.

[¶37] At trial, Ms. Loftus also described L-MHB's current demeanor, her past and present health issues, the progress she made at her foster home, and the care she will need in the future. She described L-MHB as an "outgoing," "joyous little girl" who thrives in her current home. L-MHB has also had health issues. She received occupational therapy, physical therapy, and speech therapy for several years. Ms. Loftus testified that at the time of trial, L-MHB has progressed to where she no longer needs any of the developmental services and therapies. L-MHB "still has health related issues," such as vision problems, asthma, and ongoing concerns about her brain development. Ms. Loftus testified that currently there is no bond or connection between Mother and L-MHB.[21]

### 5. Mother's Testimony

[¶38] DFS also presented testimony from Mother. Mother, Mr. Mets, and the two children they have together (one aged two and the other three months at the time of the trial) live in a trailer home in Belle Fourche, South Dakota. They were "hav[ing] problems" with someone who recently moved to their trailer park and planned to move to a new trailer park. The new trailer park is where Mr. Mets's parents live. Mr. Mets's parents provide child care when Mother cannot. Mother's two youngest children reside with Mother and Mr. Mets and qualify for Medicaid, but the parents have not applied for coverage. Their two-year-old has special needs and attends physical therapy. Mother has

---

scheduled by DFS in Rapid City, even though DFS arranged transport, and that she had refused to go to counseling scheduled in Wyoming when she lived there. Mother also told Ms. Loftus that she no longer had to comply with the case plan because "it was done"; she had signed paperwork allowing L-MHB to be adopted.

[19] Ms. Loftus felt that they were at a standstill and that it was important to include Mr. Mets (who would be L-MHB's father figure) in the plan. The new plan directed Mr. Mets and Mother to attend individual mental health counseling. Ms. Loftus also amended the drug testing goal so it would be easier for Mother to meet this requirement. The amended case plan required Mother and Mr. Mets to attend 90 days of individual counseling and sign releases so that DFS could talk to providers, verify compliance, and pay for the services. Ms. Loftus testified that Mother and Mr. Mets had recently attended marriage counseling, but the only information Mother would release to DFS was the dates of attendance.

[20] During direct examination, Mother admitted that Mr. Mets does not participate in individual counseling, as required by the case plan.

[21] Mother herself testified that she rejected DFS offers to visit L-MHB via Skype. Mother does not know what L-MHB is like today but believes L-MHB would know who she is. Mother testified she believes it would not be traumatic for L-MHB to transition out of foster care and into her home.

had conflicts with this child's providers in the past. Mother also has a thirteen-year-old child who has been adopted outside of the home. Mother testified that she currently receives social security disability benefits. She has never held regular employment. Mr. Mets is employed at Hardee's.

[¶39] Mother testified that she has been hospitalized three times in mental health inpatient facilities since the birth of L-MHB: twice in Cheyenne, in April and July 2014; and once in Casper, in August 2015. Mother testified she attended counseling in Casper from October 2015 through June 2016, when she and Mr. Mets moved to South Dakota. Mother also stated that she has attended monthly counseling in South Dakota beginning in 2017. However, she admitted she had only gone to three appointments and that she does not go to individual therapy recommended by her mental health providers and required by the case plan. She and Mr. Mets attend group marriage counseling and take their two young children with them. The marriage counselor's record of attendance showed they had attended four sessions since 2017.

[¶40] Mother also testified that she had received a psychiatric diagnostic evaluation at Behavior Management Systems in South Dakota. Mother was diagnosed with personality disorder, post-traumatic stress disorder, depression, and schizophrenia. Mother never took any of the medications prescribed as a result of the diagnoses.

[¶41] Mother testified that she had protection orders against three previous romantic partners. She also testified regarding an incident of domestic violence in July 2015 when Mr. Mets grabbed her by the back of the neck and attempted to wrap his hand around her throat. Mr. Mets was arrested for assaulting her. Mother also admitted that the Belle Fourche Police Department has had numerous contacts with her and her family, but she could not recall any specific details.

[¶42] Mother confirmed she did not provide mental health evaluations to DFS, address her mental health needs, or attend individual counseling, as required by her case plan. Mother also testified that she never signed the case plan. Mother has not seen L-MHB since she was two weeks old and has not provided her financial support.

### 6. Mr. Mets's Testimony

[¶43] Next, Mr. Mets testified regarding his numerous interactions with law enforcement in Wyoming and South Dakota. He stated that he has not had any incidents of domestic violence since May 2016, and the last time he physically abused Mother was in 2015. He characterized his relationship with Mother as "rocky," but "recently . . . a lot better."

[¶44] Mr. Mets did not sign L-MHB's case plan but is aware that the case plan requires him to attend individual counseling. He did not attend individual counseling because he "forgot all about it really," and he "figured marriage counseling would suffice." Mr.

Mets testified that his family support system consists of his church and his parents and sister, who live nearby and with whom he and Mother have had frequent conflicts.

### 7. Mother's Evidence at Trial

[¶45] After DFS presented its case, Mother testified herself and called Mr. Mets and Rebecca Larson, a South Dakota Head Start home visitor. Mother testified that Ms. Loftus had not been to see her current residence in South Dakota. She stated that she had not attended all of L-MHB's MDT meetings, that she had not participated in individual counseling, and that she did not recall law enforcement encounters in South Dakota. Mr. Mets generally testified regarding his recollection of when he almost struck Ms. Loftus with his van. Ms. Larson testified regarding her observations of the Mets family. She expressed concerns about one of the children receiving appropriate care and stated that she had reported these concerns to the South Dakota Department of Social Services. She also testified that Mother struggled to find providers that she could work with.

### *CONCLUSION*

[¶46] After five days of trial, the jury concluded that DFS had presented clear and convincing evidence that Mother was unfit to have custody and control of L-MHB. The jury's conclusion is unassailable. There was ample evidence without Dr. Collison's testimony and Exhibit 8 to show that, despite DFS' ongoing efforts, Mother was unfit to have custody and control of L-MHB as required by Wyo. Stat. Ann. § 14-2-309(a)(v).[22]

[¶47] "An error is deemed prejudicial when there is a reasonable probability that, in the absence of the improper evidence, the verdict would have been more favorable to the appellant." *Swett*, ¶ 12, 431 P.3d at 1140. There is no reasonable probability the verdict would have been more favorable to Mother in the absence of Dr. Collison's testimony and Exhibit 8. Even assuming Dr. Collison's testimony and Exhibit 8 were privileged and the district court erred in admitting them, the error was harmless. We affirm.

---

[22] This conclusion in no way implies that DFS failed to present clear and convincing evidence of the alternative ground for termination under Wyo. Stat. Ann. § 14-2-309(a)(iii) absent Dr. Collison's testimony and Exhibit 8.